IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF UTAH

CENTRAL DIVISION

| | |
|---|---|
| DENNIS R. FRANKE,<br><br>　　　　Plaintiff,<br><br>　v.<br><br>ARUP LABORATORIES,<br>　　　　Defendant. | Case No. 2:07-CV-73-DAK<br><br><br>**REPORT AND RECOMMENDATION** |

Before the court is Defendant ARUP Laboratories' Motion for Summary Judgment.  (Docket Entry #98.)  Plaintiff's Amended Complaint asserts claims that Plaintiff was denied a promotion, transfer, and ultimately terminated by Defendant in violation of Title VII, the Age Discrimination in Employment Act (hereafter "ADEA"), and the Fourteenth Amendment.  In its Motion for Summary Judgment, Defendant asserts that there is no genuine issue of material fact in this case, and that each of Plaintiff's claims fails as a matter of law.

Having carefully reviewed the parties' pleadings and having heard oral arguments in this matter, the court recommends that Defendant's motion be granted and that the case be dismissed.

## FACTUAL BACKGROUND

### A.  Plaintiff's Employment History[1]

In October 2000, Plaintiff applied for employment at ARUP and was hired to work as an Immunology Technologist. (Docket Entry #99: Exhibit A, Franke Dep., at 64; Exhibit B, New Employee Form; Exhibit C, Franke Resume, at ARUP-EEOC000128.)[2] As an Immunology Technologist, Plaintiff worked in ARUP's laboratory reviewing microscope slides containing, for example, blood samples, to determine whether the samples showed signs of disease. (Franke Resume; Franke Dep. at 147-148, 165.)  At all times, Plaintiff's employment at ARUP was at-will and could be terminated at any time for any lawful reason.  (Franke Dep. at 223-239, 247-248; Docket Entry #99, Exhibit D, At-Will Acknowledgment Forms.)

On seven separate occasions from 2000 through 2005, Plaintiff signed acknowledgment forms indicating that he understood that he was an at-will employee at ARUP and that he could "be terminated at any time, with or without cause and with

---

[1]Plaintiff is currently self-employed as the sole employee of Projectile Concepts & Manufacturing Incorporated, a company Franke described as a manufacturer of projectiles used in bullets for firearms. (Deposition of Dennis Rheem Franke ("Franke Dep.") at 10-15.)

[2]This was the second time Plaintiff worked for ARUP. Plaintiff first worked at ARUP as an R&D Specialist, Immunology Electrophoresis Technologies and Special Chemistry Technologist, from approximately 1990 until he voluntarily quit in 1999. (Franke Resume at ARUP-EEOC000128; Franke Dep. at 18-22.)

or without notice . . . ."  (At-Will Acknowledgment Forms.)  As
an at-will employee, Plaintiff had no express or implied
employment contract that entitled him to employment for any
specified period or that required ARUP to follow any procedure
before disciplining or terminating his employment.  (At-Will
Acknowledgment Forms.)

### B.  Plaintiff's Suspicion That ARUP Monitored Him With "Covert Hidden Spy Cameras"

To enter the laboratory area where Plaintiff worked
(hereafter the "Laboratory Area"), ARUP employees walked through
a secure hallway that was monitored by openly-visible
surveillance cameras housed in transparent ceiling globes.
(Franke Dep. at 154-60; Docket Entry #99, Exhibit E, Laboratory
Area Layout Diagram.)  One surveillance camera is located in the
area in the hallway where Plaintiff and other ARUP employees
"clock in" and "clock out" during the work day. (Franke Dep. at
155.)  According to Von Madsen, the Assistant Vice President of
Human Resources for Defendant, ARUP uses the security cameras to
help maintain security and to ensure compliance with time clock
procedures. (Docket Entry #99, Exhibit F, Declaration of Von
Madsen (hereafter "Madsen Decl."), ¶ 4.)

There are no security cameras in the Laboratory Area.
(Madsen Decl., ¶ 6.)  Plaintiff is suspicious, however, that
smoke detectors in the ceiling of the Laboratory Area where he
worked were not actually smoke detectors, but rather were secret,

hidden security cameras.  (Franke Dep. at 162.)  Plaintiff believes that hidden security cameras could "be used in order to generate a case, if you will, to terminate me."  (*Id.* at 161.) In support of his theory, during discovery Plaintiff produced a picture of what he contends is a surveillance camera that resembles a smoke detector.  (Docket Entry #99, Exhibit G, Brickhouse Screenshot; Franke Dep. at 157.)  Plaintiff labeled the picture "Covert Hidden Spy Camera."  (*Id.*)  The picture of the Covert Hidden Spy Camera that Plaintiff produced does not depict any device in use at ARUP (Franke Dep. at 157-58; Madsen Decl., ¶ 9), and Plaintiff never actually physically examined the smoke detectors (Franke Dep. at 297-99).

Other than his own belief that the smoke detectors in the Laboratory Area are actually "Covert Hidden Spy Cameras," Plaintiff has no evidence that the devices are anything other than smoke detectors. (Franke Dep. at 163.)  In fact, the smoke detectors in the Laboratory Area are indeed smoke detectors. (Madsen Decl., ¶ 7.)

### C.  **Plaintiff Applies For A Promotion in 2003**

In 2003, Plaintiff applied for a promotion to a Lead Technologist position in the Autoimmune Immunology section. (Franke Dep. at 71.)  During the interview, Plaintiff was asked questions about how he would respond to various problems that might arise in the new position he sought.  (*Id.* at 75-76.) Plaintiff found this line of questioning adversarial and

4

concluded that the "interview process was . . . being railroaded towards negativity, thereby allowing them to focus on problems rather than strengths." (*Id.*)  Ultimately, ARUP "de-posted" the position for which Plaintiff had applied and ARUP did not hire anyone for the job at the time. (*Id.*)  Even though ARUP de-posted the position and selected no one for the job, Plaintiff claims he was told he was not selected because ARUP management wanted "an all woman *chain-of-command*," and because Plaintiff, who was age 40 at the time, was "a bit young." (*Id.* at 84-85 (emphasis added).)

Five months later, the position was again posted, but Plaintiff never applied for the promotion. (*Id.* at 75-76.)  ARUP hired Ryan Greer, a male, for the same position which had been re-posted. (*Id.* at 437.)

Plaintiff did not file a charge of discrimination with the Utah Antidiscrimination and Labor Division (hereafter "UALD") or the Equal Employment Opportunity Commission (hereafter "EEOC") regarding his alleged failure to obtain a promotion. (*Id.* at 80, 85.)

### D.  Plaintiff Seeks A Transfer

Plaintiff also contends that he applied for a transfer in 2004, which transfer he did not receive. (Franke Dep. at 76-79.)[3]

---

[3]ARUP has no record that Plaintiff requested a transfer in 2004.  (Madsen Decl., ¶ 10.)  ARUP does have a record of Plaintiff applying for a transfer in 2002.  (*Id.*, ¶ 11.) However, Plaintiff "can't remember" whether the transfer he

Plaintiff does not know who, if anyone, received the transfer. (*Id.* at 77.)[4]

Plaintiff did not file a charge of discrimination with the UALD or the EEOC regarding his alleged failure to receive the 2004 transfer. (Id. at 80, 85.)

### E.  Plaintiff's Letter-Writing Campaign

Plaintiff was a prolific letter writer while working at ARUP, regularly writing long, detailed e-mails, letters and responses to personnel evaluations.  (Docket Entry #99, Exhibit H, Declaration of Leslie Hamilton (hereafter "Hamilton Decl."), ¶ 3.)  For example, on or about May 16, 2005, ARUP counseled Plaintiff because of his "failure to utilize the ARUP management chain to address concerns."  (Docket Entry #99, Exhibit I, May 16, 2005 Letter from ARUP to D. Franke; Franke Dep. at 365-67.) In response, Plaintiff wrote a three-page, single-spaced, detailed rejoinder. (Docket Entry #99, Exhibit J, August 2005 Letter from D. Franke to ARUP.)

Plaintiff also sent a letter, dated May 13, 2003, to Dr. Carl Kjeldsberg, then President and CEO of ARUP. (Docket Entry #99, Exhibit K, Letter from D. Franke to C. Kjeldsberg dated May

---

claims to have been discriminatorily denied was in 2002.  (Franke Dep. at 578.)

[4]Although Franke does not know who received the transfer, Franke claims a non-management co-employee who was not part of the interview said he was denied the transfer because he was male and because the transfer would have "inconvenienced" another manager.  (Franke Dep. at 78-79.)

13, 2003 (hereafter the "May 13 2003 Letter"); Franke Dep. at 500-503.)  In the May 13 Letter, Plaintiff requested a meeting with Kjeldsberg and Human Resources Director Scott McKinlay "to discuss quality, leadership, and discrimination." (*Id.*)  In his letter, Plaintiff did not explain how he had been subject to discrimination, other than to express concern about surveillance at ARUP, stating as follows:

> Surveillance capabilities within the ARUP structures have and are being upgraded. The legitimate intended uses of this capability coexist with the possibility of illegitimate use. In-person scheduling, correspondence via letter-to-the-President, or any form of internal electronic communication is detectable by third-persons and I have elected not [to] use them to request this meeting.  Theft or interference with US Postal Service Mail delivery carries substantial penalties.  Thus, I have chosen the US Postal Service and also sent both of you an independent and identical copy of this letter with proof-of-delivery to avoid any interference from persons at ARUP who have historically been undeterred by lesser potential penalties.

(*Id.*)  Plaintiff then met with McKinlay to discuss his concerns. (Franke Dep. at 502-03.)

     After meeting with McKinlay, Plaintiff wrote another letter, dated June 25, 2003, to McKinlay.  (Docket Entry #99, Exhibit L, Letter from D. Franke to S. McKinlay dated June 25, 2003 (hereafter the "June 25 Letter"); Franke Dep. at 504-505.)  In the June 25 Letter, Plaintiff again failed to include any

instances of how or when he believed he was subject to either gender or age discrimination. (*Id.*)[5]

On another occasion, ARUP Senior Vice President and Director of Technical Operations, Leslie Hamilton, received a letter from Plaintiff asking to schedule a meeting with her regarding a job opportunity.  (Docket Entry #99, Exhibit M, Letter from D. Franke to L. Hamilton dated October 2, 2003 (hereafter the "October 2 Letter), ARUP575; Hamilton Decl., ¶ 4.)  Plaintiff wrote in the October 2 Letter that he was contacting Hamilton because he had "exhausted – completely – the *chain-of-command* up to this point . . . ." (October 2 Letter, p. 1 (emphasis added).)

Plaintiff also wrote long, detailed Employee Self Assessments, which he submitted to Hamilton, such as a January 21, 2004 Employee Self Assessment in which he again spoke of the ARUP "chain-of-command."  (Docket Entry #99, Exhibit N, January 21, 2004 Employee Self Assessment for Dennis Franke (hereafter

---

[5]In the June 25 Letter, Plaintiff makes the bald assertion that "[d]iscrimination within the laboratory and closely associated areas at ARUP is now institutionalized." The June 25 Letter goes on to suggest to ARUP that it investigate certain statistical information, including "the ratio of male to female employees" in each department.  (*Id.*) Then, Plaintiff asks ARUP to consider the following convoluted questions:  "What is the pattern of lateral (not a promotion) versus vertical (promotion) transfers within the laboratory departments or starting from any laboratory department and ending in any non-laboratory department (such as marketing) relative to gender for the previous 5 years?" (*Id.*) However, at no point in the June 25 Letter does Plaintiff ever attempt to identify any incidents where he was actually subject to discrimination or where ARUP engaged in any form of specific discrimination. (*Id.*)

"Employee Self Assessment"); Hamilton Decl., ¶ 5.)  In the
three-page, single-spaced Employee Self Assessment, Plaintiff
wrote:

> This self assessment is brief as I have
> omitted all information which must be
> maintained as confidential within the ARUP
> recognized *chain-of-command*. I have good
> reason to believe that employee submitted
> information which by any reasonable standard
> should be treated as confidential is becoming
> available to non-supervisory personnel on a
> regular basis – resulting in one or more acts
> of retaliation against the employee(s) who
> initial [sic] submitted the confidential
> information to supervision.

(Employee Self Assessment, p. 1 (emphasis added).)

Again, on August 9, 2004, Plaintiff wrote Hamilton another
detailed, single-spaced e-mail in which he complained about ARUP
laboratory validation procedures.  (Docket Entry #99, Exhibit O,
E-mail dated August 9, 2004, from D. Franke to L. Hamilton
(hereafter the "August 9 E-mail").)  In this long, single-spaced
August 9 e-mail, Plaintiff complained to Hamilton that an
"ongoing string of events" associated with testing procedure were
"designed to pressure or trap [Plaintiff] into doing something
unethical . . . ." (*Id.*)  Plaintiff also asked Hamilton to keep
his e-mail confidential because "[t]he situation is so fluid and
unpredictable I can't tell who's after who or who's trying to
gain an advantage using what methods so it's just better not to
add any additional dimensions to the area until the dust
settles." (*Id.*)

### E.  ARUP Receives An Anonymous Letter

In early February 2006, ARUP announced some routine policy changes to its employees.  Shortly after the announcement, Hamilton learned from an ARUP manager that an ARUP employee had reported to the manager that Plaintiff had complained to the employee about the policy changes in a manner that the employee found to be paranoid.  (Hamilton Decl., ¶¶ 6, 7.)  Hamilton understood that Plaintiff was roaming the laboratory talking to employees in an attempt to organize opposition to the policy changes and to encourage employees to write letters to management complaining about the policy changes.  (*Id.*; Docket Entry #99, Exhibit P, 02/27/06 Note.)  Plaintiff told others that if they were going to send letters to the ARUP management, they should do so anonymously.  (Franke Dep. at 105-06.)  Shortly after ARUP's policy change, on or about February 17, 2006, Dr. Ron Weiss, President and Chief Operating Officer of ARUP, received an anonymous letter (hereafter the "Anonymous Letter") addressed to "Dear ARUP President."  (Docket Entry #99, Exhibit Q, ARUP's Response to Discovery Requests, Response to Interrogatory No. 1 ("Interrogatory Response No. 1").)  The Anonymous Letter stated, in part, as follows:

> ARUP upper management no longer controls
> either the clinical laboratory or departments
> in direct support of it.  Essentially all
> information concerning the clinical
> laboratory is controlled, filtered, and
> selectively edited by *elements* of middle
> management before being passed upward.  These

10

*elements* are aware of your personal beliefs
and biases.  As well, they directly control
their subordinates and coerce them to provide
predetermined "correct" reports or face
public degradation and humiliation.  While
enjoying free and direct access to all levels
of the *chain of command* both above and below
themselves they jealously demand strict
adherence to the same *chain of command* of
their own subordinates.

. . .

If you believe your own propaganda machine it
is suggested that you either retire now or
increase your personal liability insurance.
A brief accounting of casualties of the sweat
shop so far include multiple employees
leaving or transferring away from problem
areas, one employee who tried to commit
suicide by slitting her wrists and one
employee that quit and then committed
suicide.  This small sampling of horror gives
an accurate impression of what is called a
hostile workplace.  We can only hope that
when someone finally loses it completely at
ARUP that they direct their rage at their
tormentors and not at other, innocent
employees with no power to alter anyone's
working conditions.  Although we may die our
families will benefit greatly from the
litigation based on our inability to defend
ourselves while at ARUP.

(Docket Entry #99, Exhibit R, Anonymous Letter (emphasis added).)

Weiss forwarded the Anonymous Letter to Hamilton.  (Interrogatory

Response No. 1.)

Hamilton reviewed the Anonymous Letter in comparison with

Plaintiff's previous communications and concluded that the

letters bore hallmarks of Plaintiff's earlier communications with

ARUP. (*Id.*)  For instance, Hamilton found the Anonymous Letter to

be long and rambling, just as she found previous communications, such as Plaintiff's October 2 Letter, the August 9 e-mail, and Plaintiff's Employee Self Assessment, to be long and rambling. (Hamilton Decl., ¶ 11.)  Hamilton also recognized certain themes in the Anonymous Letter that were present in her previous communications with Plaintiff.  For example, the Anonymous Letter used the phrase "chain-of-command," words Plaintiff used previously in his October 2 Letter and his Employee Self Assessment. (*Id.*, ¶ 12.)[6]  Additionally, the Anonymous Letter complained generally about management and administrative matters, topics that Hamilton knew Plaintiff had complained about previously. (*Id.*, ¶ 13.)

Shortly after ARUP received the Anonymous Letter, the company received two more unsigned letters that complained about recent ARUP policy changes and attacked ARUP management on various fronts (hereafter the "Additional Anonymous Letters"). (Docket Entry #99, Exhibit S, Additional Anonymous Letters (ARUP 4, ARUP 564); Interrogatory Response No. 1.)

_____

[6]In his deposition, Plaintiff repeatedly used the phrase "chain of command" when describing his concerns about upper management at ARUP.  (*See* Franke Dep. at 84, 105-106, 131, 270, 366-367, 388, 428, 477, 482, 489, 554, 560.)  Plaintiff also peppered his deposition with the word "element" to describe other individuals and perceived factions at ARUP.  (*Id.* at 52, 61, 105, 134, 193, 226-228, 270, 423.)  For example, Plaintiff referred to two ARUP employees with whom he worked as examples of "a criminal element" at the company.  (*Id.* at 51-54.)  The author of the Anonymous Letter also favored use of the word "element" to indicate a person or various people at ARUP.

In her investigation, Hamilton learned that Plaintiff had solicited other employees to engage in a letter-writing campaign directed at management to air grievances about the recent policy changes. (Hamilton Decl., ¶ 8.)  Hamilton further considered the fact that Plaintiff was the only significantly disgruntled employee in technical operations at ARUP and the only ARUP employee who had regularly written to ARUP in the past regarding the same perceived issues at ARUP.  (*Id.* at ¶ 18.)

Hamilton reviewed the Anonymous Letter's statements that ARUP's President "increase [his] personal liability insurance," the Anonymous Letter's images regarding suicide, the author's "hope" that when "someone finally loses it completely at ARUP that they will direct their rage at their tormentors," and the Anonymous Letter's passage stating "[a]lthough we may die[,] our families will benefit greatly from the litigation . . . ." (Interrogatory Response No. 1.)

After consulting with ARUP Assistant Vice President, Human Resources Manager, Von Madsen, Hamilton and Madsen determined that the Anonymous Letter was threatening and that Plaintiff wrote or was involved in writing or creating the Anonymous Letter and the two additional letters.  (Interrogatory Response No. 1; Hamilton Decl., ¶ 19; Madsen Decl., ¶ 13.)

Hamilton and Madsen met with Plaintiff on or about February 28, 2006.  At the February 28, 2006 meeting, Hamilton told Plaintiff that the decision had been made to release him.  (*Id.;*

Franke Dep. at 93-99.)   The decision to terminate Plaintiff was
made by Hamilton and Madsen.   (Franke Dep. at 98-99.)

### F.   Plaintiff Does Not Deny Authoring, or His Involvement in the Anonymous Letters

During his deposition, Plaintiff testified he did not
"recollect" writing any anonymous letters to ARUP:

> Q: I'm asking you if you have any knowledge
> regarding this [Anonymous Letter]?
>
> A. Of what?
>
> Q: Of the existence of this letter.
>
> A. It appeared in discovery, and I'm waiting
> to find out why you think this document is
> significant to this case. I mean, that's my
> position. I don't know –
>
> Q: Prior to receiving this letter in
> discovery, did you have any knowledge of this
> letter?
>
> A: I do not recall any knowledge of this
> letter.
>
> Q: And you've never seen this letter before?
>
> A: I don't recollect any vision of this
> letter.
>
> . . .
>
> Q: During January and February of 2006, did
> you write any anonymous letters?
>
> A: To whom?
>
> Q: To anybody.
>
> A: Not that I recollect.
>
> Q: Did you participate in the writing of any
> anonymous letters with anyone?

> A: Not knowingly. If I said something and
> somebody quoted me, I won't be held
> responsible for that. That's the point I'm
> making when I say that.

(Franke Dep. at 104, 110-112, 114.)

### G.  Plaintiff Believes He is the Target
of a Female Conspiracy at ARUP

Plaintiff believed that there was a "female conspiracy" at ARUP whose objective was to prevent his advancement at the company and ultimately "actively recommended" his termination. (*Id.* at 67-68.)  Plaintiff believed that at ARUP, "females in general benefit from what amounts to a conspiracy to benefit females in the laboratory.  Now, whether or not that is active or whether its passive might be an issue.  But, in general, as I've stated before, the females and anyone in cooperation with them. I'm not in a position to say who did exactly what and when. " (*Id.* at 434-35.)

### H.  Franke's Administrative Filing

On or about September 26, 2006, Plaintiff filed a Charge of Discrimination with the UALD.  (Docket Entry #99, Exhibit T, Charge of Discrimination dated September 26, 2006 (the "Charge").)  The Charge does not include any allegation that Plaintiff was denied a promotion or a transfer.  (*Id.*)  Instead, the only adverse action that Plaintiff alleges he suffered in the Charge was his February 28, 2006 termination.  (*Id.*)

15

## PROCEDURAL HISTORY

On February 12, 2007, less than five months after filing his Charge of Discrimination with the UALD, Plaintiff, who is proceeding pro se,[7] filed his complaint on February 12, 2007. (Docket Entry #1.)  Plaintiff then filed an Amended Complaint on October 1, 2008, claiming that he was denied a promotion, transfer, and ultimately terminated in violation of Title VII, the ADEA, and the Fourteenth Amendment.  (Docket Entry #59.)

On March 27, 2009, Defendant filed its Motion for Summary Judgment, with a supporting memorandum and exhibits.  (Docket Entries #98, 99.)  On May 15, 2009, Plaintiff filed his Memorandum in Opposition to Defendant's motion, with supporting exhibits.  (Docket Entries #103-105.)  Defendant filed its Reply to Plaintiff's opposition on June 25, 2009, with more supporting exhibits.  (Docket Entry #109.)  On August 31, 2009, the court held a hearing on Defendant's motion.  (Docket Entry #112.)

## ANALYSIS

Defendant brings its Motion for Summary Judgment, claiming that the pleadings, the discovery and disclosure materials, and affidavits submitted show that there is no genuine issue as to any material fact and that Defendant is entitled to judgment as a matter of law.  *See* Fed. R. Civ. P. 56(c).

---

[7]Because Plaintiff is proceeding pro se, the court liberally construes his pleadings.  *See Ledbetter v. City of Topeka, Kansas*, 318 F.3d 1183, 1187 (10th Cir. 2003).

Having carefully reviewed the parties' submissions, the court recommends that Defendant's motion for summary judgment be granted. Plaintiff has failed to properly identify and controvert any issue of material fact. In fact, because Plaintiff has not properly disputed any of Defendant's "undisputed facts," the court has adopted Defendant's facts as its own, as set forth above.

In addition, as Defendant argues, Plaintiff's claims that he was denied a promotion, transfer, and ultimately terminated in violation of Title VII, the ADEA, and the Fourteenth Amendment are founded on Plaintiff's many suspicious assertions and arguments, but no evidence.

Plaintiff's Title VII and ADEA claims relate to his (1) alleged failure to obtain a promotion, (2) alleged denial of a transfer, and (3) termination. Plaintiff's failure to promote and transfer claims must be dismissed as untimely under the 300-day statute of limitations governing these discrete claims. Further, Plaintiff failed to file any charge of discrimination regarding his failure to promote and transfer claims. Thus, he cannot show that he exhausted the administrative remedies required before this Court can even assume jurisdiction over these claims. Plaintiff also cannot satisfy the prima facie elements of his failure to promote and transfer claims.

Regarding his wrongful termination claim, Plaintiff cannot show pretext with regard to Defendant's honestly-held belief that

Plaintiff authored or was involved in an anonymous letter sent to Defendant that referenced slit wrists, horror, and death, and two related letters.  Because Defendant terminated Plaintiff for these legitimate, non-discriminatory business reasons, summary judgment should be granted as to the wrongful termination claim.

Plaintiff's Fourteenth Amendment claim also fails and must be dismissed.  Plaintiff contends that he enjoyed a property interest in his job and that his Fourteenth Amendment rights were violated when his employment was terminated without due process. Plaintiff's claim in this regard is fundamentally flawed because there is no dispute that Plaintiff was an at-will employee. Under controlling Tenth Circuit Law, "[a]t-will employees lack a property interest in continued employment." *Darr v. Town of Telluride, Colo.*, 495 F.3d 1243, 1251 (10th Cir. 2007).  As such, Plaintiff cannot demonstrate the required property interest in his employment at ARUP, and for this reason his Fourteenth Amendment claim fails.

## I.  NO GENUINE ISSUE OF MATERIAL FACT EXISTS

Despite Plaintiff's lengthy pleading and exhibits, and despite the extensive editorializing about them, Plaintiff has not properly disputed or controverted any of the material facts Defendant asserted in its pleadings, which the court has adopted and set forth above.

Rule 56 of the Federal Rules of Civil Procedure provides:

> When a motion for summary judgment is
> properly made and supported, an opposing
> party may not rely merely on allegations or
> denials in its own pleadings; rather, its
> response must – by affidavits or as otherwise
> provided in this rule – set out specific
> facts showing a genuine issue for trial. If
> the opposing party does not so respond,
> summary judgment should, if appropriate, be
> entered against that party.

Fed. R. Civ. P. 56(e)(2).  In addition, this court's local rules

require:

> A memorandum in opposition to a motion for
> summary judgment must begin with a section
> that contains a concise statement of material
> facts as to which the party contends a
> genuine issues exists.  Each fact in dispute
> must be numbered, must refer with
> particularity *to those portions of the record
> on which the opposing party relies* and, if
> applicable, must state the number of the
> movant's fact that is disputed.  All material
> facts of record meeting the requirements of
> Fed. R. Civ. P. 56 that are set forth with
> particularity in the statement of the movant
> will be deemed admitted for the purpose of
> summary judgment, unless specifically
> controverted by the statement of the opposing
> party identifying material facts of record
> meeting the requirements of Fed. R. Civ. P.
> 56.

DUCivR 56-1(c) (emphasis added).

Plaintiff's attempts to dispute Defendant's facts fail to

comply with these controlling rules.  For example, Plaintiff's

"undisputed facts" section is largely devoid of actual citations

to the record.[8]  As a result, Plaintiff has failed to "set out

---

[8]Plaintiff occasionally makes reference to documents that he
contends "contain[ ] information" related to a portion of his
factual statements.  (Docket Entry #103, at 5.) However, these

facts that would be admissible in evidence" or "refer with
particularity to those portions of the record on which the
opposing party relies," in violation of Federal Rule of Civil
Procedure 56(e)(1) and its local counterpart.  Moreover,
Plaintiff's attempts to dispute Defendant's facts contradict his
own deposition testimony or otherwise procedurally fail as set
forth in detail in Defendant's Reply Memorandum.  (Docket Entry
#109, at 6-8.)

     While the court has carefully focused on Plaintiff's
"undisputed facts" section, the court notes that Plaintiff has
submitted an enormous volume of additional pleadings and
documents; however, in sorting through Plaintiff's submitted
material, the court has not found any admissible evidence that
creates a question of fact.  Plaintiff never clearly identifies
the existence of a question of fact and where that fact might be
supported in the record.  *See Downes v. Beach*, 587 F.2d 469, 472
(10th Cir. 1978) (explaining that on summary judgment, the trial
court "is not required to consider what the parties failed to
point out").  In the more than 400 pages of Plaintiff's

_____

documents tend to be documents that Defendant already submitted.
(See, e.g., Plaintiff's reference to Letter from D. Franke to C.
Kjeldsberg and S. McKinnlay, dated May 13, 2003, attached
as Exhibit K to Docket Entry #99, ARUP's Memo in Support.)  In
other instances, Plaintiff attaches documents not produced during
discovery and which are neither authenticated nor part of the
record.  At least 62 pages of documents attached to Plaintiff's
Response to Defendant's Motion for Summary Judgment were not
produced during discovery.  (Docket Entry #109, Exhibit A,
Declaration of Cheryl Buhler ("Buhler Decl."), ¶ 8.)

submissions on summary judgment, it appears that Plaintiff has not clearly identified any factual questions, and the court itself has not been able to identify one.

Furthermore, at oral argument, the court directly asked Plaintiff to verbally identify a factual question, warning Plaintiff that it had not been able to identify one in Plaintiff's pleadings.  Rather than identifying such a factual issue, Plaintiff opted to rely on thirty-seven more pages of submissions he gave to the court at oral argument.  The court has examined these submissions, but concludes, as with Plaintiff's other submissions opposing Defendant's summary judgment motion, that they do not properly identify and controvert any factual issue.

As a result of Plaintiff's failure to controvert Defendant's facts, the court adopts those facts, as set forth above, and concludes that Plaintiff has not shown that there is a "genuine issue as to any material fact."  Fed. R. Civ. P. 56(c).

## II.   DEFENDANT IS ENTITLED TO JUDGMENT AS A MATTER OF LAW

Plaintiff claims he was subject to gender discrimination in violation of Title VII and age discrimination in violation of the ADEA in connection with three incidents when Defendant allegedly (1) failed to promote him in 2003 and transfer him in 2004, and (2) wrongfully terminated him in 2006.  Plaintiff further contends that Defendant violated his Fourteenth Amendment rights by failing to provide him due process when he was terminated in

2006.  (Docket Entry #59, Amended Complaint, at 2, ¶ 6; Franke
Dep. at 62-63.)  As explained below, each of these claims fails
as a matter of law.[9]

### A.   TITLE VII AND ADEA CLAIMS

### 1.   Failure To Promote And Failure To Transfer Claims

### a.   300-Day Statute of Limitations

Title VII and The ADEA require a plaintiff to file a charge
of discrimination within 300 days "'after the alleged unlawful
employment practice occurred.'"[10]  *National RR Passenger Corp. v.
Morgan*, 536 U.S. 101, 104-05, 109 (2002) (*quoting* 42 U.S.C. §
2000e-5(e)(1)); *accord Duncan v. Manager, Dept. of Safety*, 397
F.3d 1300, 1308 (10th Cir. 2005).  The ADEA is governed by an
identical 300-day statute of limitations.  *See* 29 U.S.C. §

---

[9]In his response to Defendant's Summary Judgment Motion,
Plaintiff also claims he was subject to (1) hostile work
environment discrimination and (2) "pattern-or-practice type"
discrimination.  The court does not address these two claims
which are not included in Plaintiff's Complaint, and which
Defendant, therefore, did not address in its Motion for Summary
Judgment.  Plaintiff's hostile work environment claim is not
properly before the court, so the court refuses to address it.
The court denied Plaintiff's motion to amend his complaint to add
this claim (Docket Entry #102.)  As to Plaintiff's attempt to
assert a pattern or practice discrimination claim, the Tenth
Circuit has held "that individual plaintiffs may not utilize the
pattern or practice method of proof in Title VII suits."
*Semsroth v. City of Wichita*, 2008 WL 5328466, *6 (10th Cir. Dec.
22, 2008).

[10]In states such as Utah where a state agency has authority
to investigate employment discrimination claims (known as
deferral states), Title VII requires claimants to file a charge
of discrimination within 300-days of the alleged unlawful
employment practice.  *See* 42 U.S.C. § 2000e-5(e)(1).

626(d).  Regarding the 300-day statute of limitations, the Tenth
Circuit has held that:

> The very precision of this requirement – not
> a year, not six months, not the state law
> statute of limitations for comparable causes
> of action – bespeaks Congress's concern.
> Title VII is not intended to allow employees
> to dredge up old grievances; they must
> promptly report and take action on
> discriminatory acts when they occur.
> Unlitigated bygones are bygones.

*Duncan*, 397 F.3d at 1308 (citation omitted).  Because Plaintiff
filed his Charge on September 26, 2006, any cause of action
accruing before December 1, 2005, must be dismissed.  *See id.*
Plaintiff's claim that ARUP failed to promote him in 2003, and
failed to transfer him in 2004, constitute claims accruing before
December 1, 2005, and thus fail under Title VII's and the ADEA's
300-day statute of limitations.  Importantly, the denial of a
promotion and denial of a transfer are "discrete acts" of
discrimination after which a charge of discrimination must be
filed within the 300-day limitation period.[11]  *See Morgan*, 536
U.S. at 114 (holding that "discrete acts" include "termination,
*failure to promote, denial of transfer* . . . ." (emphasis
added)).  Because there is no dispute that Plaintiff failed to
timely file an administrative charge, Plaintiff's failure to
promote or failure to transfer claims must be dismissed.

---

[11]It obviously follows that if Plaintiff sought the transfer
in 2002, this claim is also time barred.

### b.   Failure to Exhaust Administrative Remedies
### with Regard to Failure to Promote and Transfer Claims

Plaintiff's failure to promote and transfer claims also fail because Plaintiff failed to exhaust his administrative remedies for each claim.  A plaintiff must exhaust his administrative remedies by appropriately filing an administrative charge before filing a Title VII or ADEA action in federal court.  *See Ingels v. Thiokal Corp.*, 42 F.3d 616, 619-20, 625 (10th Cir. 1994) (ADEA), *abrogated on other grounds*, *Martinez v. Potter*, 347 F.3d 1208, 1210 (10th Cir. 2004); *Martin v. Nannie and Newborns, Inc.*, 3 F.3d 1410, 1414 (10th Cir. 1993) (Title VII), *overruled on other grounds, Morgan*, 536 U.S. 101.  There is no dispute that Plaintiff failed to file any charge of discrimination in connection with his failure to promote and failure to transfer claims. Plaintiff's failure to file a charge of discrimination addressing those allegations constitutes a fatal failure to exhaust his administrative remedies.  Hence, Plaintiff's failure to promote and failure to transfer claims must be dismissed.  *See Jones v. U.P.S., Inc.*, 502 F.3d 1176, 1183 (10th Cir. 2007) ("In the Tenth Circuit, exhaustion of administrative remedies is a jurisdictional prerequisite to suit." (citation omitted)).

### c.   Inability to Establish a
### Prima Facie Case of Discrimination
### with Regard to Failure to Promote Claim

Even if Plaintiff's failure to promote claim were not time barred or administratively faulty, it fails because Plaintiff

cannot establish a prima facie case of discrimination in connection with this claim.  To establish a prima facie case of discrimination for failure to promote, Plaintiff must show that (1) he belongs to a protected class; (2) he applied and was qualified for a position for which ARUP was seeking applicants; (3) despite being qualified, he was rejected; and (4) he was treated less favorably than others, and after being rejected, the position remained open and ARUP continued to seek applications from persons of his qualifications.  *See Kendrick v. Penske Transp. Services, Inc.*, 220 F.3d 1220, 1226 (10th Cir. 2000) (affirming summary judgment in favor of employer).  Plaintiff cannot establish a prima facie case for failure to promote for the simple reason that he failed to apply for the position in question.  There is no dispute that ARUP initially closed the position that Plaintiff sought and hired no one.  Further, there is no dispute that when ARUP reopened the position, Plaintiff failed to apply.  Having failed to apply, Plaintiff also cannot show that he was rejected, or that he was treated less favorably than any successful candidates.  In fact, ARUP hired another male, Ryan Greer, once the position was re-opened (and Plaintiff

failed to apply for the re-position).[12]  It follows that summary
judgment must issue.

### d.  Inability to Establish a Prima Facie Case of Discrimination with Regard to Failure to Transfer Claim

Even if Plaintiff's failure to transfer claim was not time
barred or administratively faulty, this claim also fails for lack
of a prima facie case.  To establish a prima facia case of
discrimination for failure to transfer, Plaintiff must show that
(1) he belongs to a protected class; (2) he sought and was
qualified for a job for which ARUP was seeking applicants; (3)
despite his qualifications, he was not transferred into that
position; and (4) after his rejection, the position remained
opened and ARUP continued to seek applicants from people of
Plaintiff's qualifications.  *See Amro v. Boeing Co.*, 232 F.3d
790, 797 (10th Cir. 2000) (affirming dismissal of plaintiff's
discrimination claim in connection with transfers).  Plaintiff
cannot establish the final prima facie element of his denial of

---

[12]That ARUP hired Ryan Greer obviously renders moot
Plaintiff's inadmissible hearsay evidence that he was told he was
not hired for the position so that ARUP could preserve an "all
woman chain of command."  Furthermore, the only evidence
Plaintiff advances that he was denied a promotion because of his
age was his inadmissible, hearsay evidence that ARUP declined to
promote him because he was "too young" for the position.  The
ADEA, however, was enacted to protect those who are "too old,"
not "too young."  *See General Dynamics Land Systems, Inc. v.
Cline*, 540 U.S. 581, 593 (2004) (discussing the U.S. Supreme
Court's "consistent understanding that the text, structure, and
history point to the ADEA as a remedy for unfair preference based
on relative youth, leaving complaints of the relatively young
outside the statutory concern.").

transfer claim because he cannot show that after his rejection for the transfer, ARUP continued to seek applicants from people of Plaintiff's qualifications.  *See id.*  In fact, Plaintiff does not know who, if anyone, ARUP placed in the position.  (Franke Dep. at 339.)  As such, Plaintiff's claim fails as a matter of law.

### 2.  2006 Wrongful Discharge Claim

#### a.  Honest Belief

Plaintiff's discriminatory termination claim also fails as a matter of law. In order to establish a claim for wrongful termination in violation of Title VII and The ADEA, Plaintiff must show that (1) he was a member of a protected class, (2) he was performing his job satisfactorily, and (3) he was terminated under circumstances giving rise to an inference of discrimination.  *See Salguero v. City of Clovis*, 366 F.3d 1168, 1175 (10th Cir. 2004) (dismissing on summary judgment plaintiff's discrimination claim); *Haynes v. Level 3 Comm., LLC*, 456 F.3d 1215, 1225, n. 11 (10th Cir. 2006) (affirming summary judgment dismissal of plaintiff's ADEA claim).  If Plaintiff satisfies these prima facie elements, Defendant must respond by proffering "legitimate, non-discriminatory reason[s]" for Plaintiff's discharge.  *Salguero*, 366 F.3d at 1175.  If Defendant satisfies this standard, the burden shifts back to Plaintiff to provide evidence showing that Defendant's proffered reasons were "a pretext" for discrimination.  *Id.*

Defendant's proffered reason for terminating Plaintiff was that Hamilton and Madsen honestly believed that Plaintiff wrote or was involved in writing or creating the Anonymous Letter and the Additional Anonymous Letters, which Hamilton and Madsen found threatening.[13]  The burden now shifts to Plaintiff to attempt to demonstrate that Defendant's reasons for releasing him were a pretext for discrimination. To show pretext, Plaintiff must now attempt to show "that the employer's proffered explanation is unworthy of credence." *Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 143 (2000) (citations omitted).  In this pretext analysis, "[t]he relevant inquiry is not whether [the defendant's] proffered reasons were wise, fair or correct, but whether [it] honestly believed those reasons and acted in good faith upon those beliefs." *Exum v. U.S. Olympic Comm.*, 389 F.3d 1130, 1138 (10th Cir. 2004) (quotation omitted).  There is no dispute that Hamilton and Madsen "honestly believed" that Plaintiff drafted or was involved in drafting the Anonymous Letter and the Additional Anonymous Letters, and that they found the letters, with references to slit wrists, rage, horror, personal liability insurance and death, to be threatening. Indeed, Hamilton's and Madsen's conclusions regarding Plaintiff's

---

[13]Defendant need only proffer, and not evidence, its legitimate business reason for terminating Plaintiff. "This burden is one of production, not persuasion; it 'can involve no credibility assessment.'" *St. Mary's Honor Center v. Hicks*, 509 U.S. 502, 509 (1993) (citations omitted).

association with the letters was fully supported by the facts available to them at the time.  Hamilton investigated the letters, found that they bore similarities to Plaintiff's past communications, used similar words and phrases such as "chain-of-command," and complained about similar administrative and managerial matters about which Plaintiff had previously complained.  Equally important, Hamilton understood Plaintiff to have solicited others to write letters like the Anonymous Letters, and that Plaintiff was the only significantly disenfranchised employee in his area.  It is not surprising, then, that Hamilton and Madsen concluded that Plaintiff either actually drafted the letters in question, or was involved in drafting the letters.[14]

Even if Hamilton and Madsen were incorrect in concluding Plaintiff wrote or was involved in writing the letters, summary judgment is still warranted.  Whether Plaintiff was in fact the author of the letters "is largely beside the point: what counts is whether the decisionmaker . . . *believed* the plaintiff to be the author and, if so, whether he acted on that belief in deciding to send the plaintiff packing."  *Bennett v. Saint-Gobain Corp.*, 507 F.3d 23, 32 (1st Cir. 2007) (upholding termination of employee believed to have sent anonymous poems) (emphasis in

---

[14]Having failed to depose Hamilton, Plaintiff simply cannot challenge Hamilton's good faith conclusions that Plaintiff authored or was involved in drafting the Anonymous Letter.

original); *see also Young v. Dillon Companies, Inc.*, 468 F.3d 1243, 1250 (10th Cir. 2006) (The court's role "is to prevent intentional discriminatory . . . practices, not to act as a 'super personnel department,' second guessing employers' honestly held (even if erroneous) business judgments.") (Citation omitted).  Accordingly, even if Plaintiff were to vigorously deny his involvement in the letters (which he did not do at his deposition), his denial does not dispute Hamilton's and Madsen's honestly held belief that he authored or was involved in writing the letters.[15]  As such, Defendant should be granted summary judgment as to this claim.

### b.  Disparate Treatment

A plaintiff seeking to show pretext may also do so "by providing evidence that he was treated differently than other similarly-situated employees who violated work rules of comparable seriousness." *Kendrick*, 220 F.3d at 1230 (citation

---

[15]The court notes that Hamilton's and Madsen's conclusion that Plaintiff authored the letters or was involved in writing the letters appears to be supported by record evidence.  In his deposition, Plaintiff does not deny "any involvement" in the letters; he merely testifies that he cannot recall having done so.  Even a cursory comparison of the Anonymous Letter with Plaintiff's previous communications shows that Plaintiff and the author of the Anonymous Letter used the phrase "chain-of-command" in reference to ARUP management, a consistency that figured prominently in Hamilton's decisionmaking.  Plaintiff also regularly used this terminology throughout his deposition.  Further, there is no dispute that, after Plaintiff was released, ARUP received no more anonymous letters.  Thus, even today one cannot take issue with Hamilton's and Madsen's conclusion that Plaintiff wrote or was involved in writing the letters.

omitted).  Plaintiff cannot show pretext utilizing this test because, quite simply, there were no other similarly situated employees who Hamilton and Madsen determined authored or were involved in writing anonymous letters.

In his Amended Complaint, Plaintiff also alleges that he was the victim of discrimination because Defendant subjected him to "[i]ncreased surveillance of [his] work area" and that he was given "[u]nequal wages" in comparison to his female "co-conspirators."  (Docket Entry #59, Amended Complaint, ¶ 6.) These allegations do not show pretext and provide no evidence of discrimination.  For instance, there is no evidence that Plaintiff was subject to increased surveillance in his work area. Plaintiff's speculation that smoke detectors in the Laboratory Area were in fact surveillance cameras is just that, speculation, and insufficient to defeat summary judgment.  *See Bennett*, 507 F.3d at 31 ("[C]onjecture cannot take the place of proof in the summary judgment calculus.").  In any event, the perceived surveillance did not result in any adverse action against, or have any other discriminatory affect on Plaintiff.  With regard to wages, there is no evidence that Plaintiff was disparately paid in comparison to other employees.  In fact, Plaintiff admitted that the manner in which Defendant paid Plaintiff and other similarly-situated employees was "consistent with what I know is ARUP's stated policy to try and pay everybody at a certain level . . . ."  (Franke Dep. at 180.)  Accordingly,

Plaintiff has come forward with no evidence that he was treated dissimilarly than other similarly-situated employees, and thus he cannot show pretext.  Because Plaintiff cannot show pretext, Defendants should be granted summary judgment on this claim.

### c.  Retaliation

Plaintiff has not included a claim for retaliation in his Amended Complaint, but has occasionally contended that he was the victim of retaliation.  The only possible basis for such a claim would be that Defendant allegedly released Plaintiff in February 2006 in retaliation for the May activity in connection with the May 16, 2005 counseling.  Furthermore, two years separated the May 13 Letter and Plaintiff's May 16, 2005 counseling.  This little time defeats Plaintiff's prima facie claim for retaliation.  *See Anderson*, 181 F.3d at 1178-79.  In any event, Plaintiff never suffered any adverse action arising out of the May 16, 2005 counseling and, as such, cannot establish a prima facie case of retaliation.  In addition, any retaliation claim associated with the May 16, 2005 counseling is time barred, since the letter predates the December 1, 2005 cutoff established by the ADEA's and Title VII's 300-day statute of limitations, as discussed above.

Finally, Plaintiff makes vague allegations that he is suspicious that his difficulties in finding reemployment are attributable to Defendant.  Plaintiff, however, has presented no record evidence that Defendant has made any effort to interfere

with Plaintiff's attempts at reemployment. Plaintiff does,
however, provide record evidence that his own communications with
prospective employers would be of concern to prospective
employers.  For example, in his resume Plaintiff introduces
himself to potential employers as follows:

> My personal facial expression is often
> described as inscrutable. I'm fluently
> literate and conversant. My
> personal/professional interest in
> risk-control and emphasis on quality can be
> disconcerting to the incompetent and/or
> criminal element.  I also have a knack for
> predicting future events.  I've been
> encouraged to apply to be the supervisor for
> many I have mentored.  Properly utilized, my
> personality can be effective in varied roles.
> In a corrupt organization, management often
> regards me to be a threat to their job
> security.

(Franke Resume.)

## B.  PLAINTIFF'S DUE PROCESS CLAIM

Plaintiff's due process claim fails as a matter of law.  In
order to determine whether an employee was denied procedural due
process, "courts must engage in a two step inquiry: (1) did the
employee possess the protected property interest such that due
process protections were applicable; and, if so, then (2) was the
individual afforded an appropriate level of process."
*Brammer-Hoelter v. Twin Peaks Charter Acad.*, 492 F.3d 1192, 1209
(10th Cir. 2007).  Plaintiff's due process claim fails because
Plaintiff cannot establish that he possessed a protected property
interest in his employment at ARUP.  "[A]n employee may possess a

33

property interest in public employment if she has tenure, a
contract for a fixed term, an implied promise of continued
employment, or if state law allows dismissal only for cause or
its equivalent." *Darr v. Town of Telluride, Colo.*, 495 F.3d
1243, 1251 (10th Cir. 2007).

Plaintiff cannot establish any of these factors.  Plaintiff
was not a tenured employee, he had no contract for a fixed term,
nor can he point to any promise of continued employment.
Plaintiff was an at-will employee who could be terminated at any
time for any lawful reason, and he was not entitled to any
procedural protection before his termination.  It is undisputed
that on seven separate occasions Plaintiff signed statements
confirming his status as an at-will employee at ARUP throughout
his employment there.  (At-Will Acknowledgment Forms.)  "At-will
employees lack a property interest in continued employment."  *Id.*
at 1252.  Plaintiff also has not pointed to, and cannot point to,
any state statute, regulation or rule that affords him a property
interest in his position at ARUP.  As such, there is simply no
statutory, regulatory, rule-based or contractual source for a
property interest in Plaintiff's job.  As a result, the court
must recommends that Defendant's Motion for Summary Judgment be
granted as to Plaintiff's claim for termination in violation of
his due process rights.

## RECOMMENDATION

Based on the above analysis, the court concludes that there is no genuine issue as to any material fact and that Defendant is entitled to judgment as a matter of law.  As a result, **IT IS RECOMMENDED** that Defendant's Motion for Summary Judgment (Docket Entry #98) be **GRANTED** and Plaintiff's case be **DISMISSED.**

Copies of the foregoing report and recommendation are being mailed to the parties who are hereby notified of their right to object to the same.  The parties are further notified that they must file any objections to the report and recommendation, with the clerk of the district court, pursuant to 28 U.S.C. § 636(b), within ten (10) days after receiving it.  Failure to file objections may constitute a waiver of those objections on subsequent appellate review.

DATED this 8th day of September, 2009.

BY THE COURT:

_____
SAMUEL ALBA
United States Magistrate Judge